**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

**TROY D. BROWN**                                                                 **PLAINTIFF**

**V.**                                                            **NO. 4:14-CV-00114-DMB-JMV**

**LEFLORE COUNTY, MISSISSIPPI**                                  **DEFENDANT**

**OPINION AND ORDER DENYING**
**MOTION FOR SUMMARY JUDGMENT**

This is a First Amendment retaliation case in which Plaintiff Troy D. Brown alleges that

he was wrongly discharged from his position as Director of the Greenwood Leflore Emergency

Management Agency because of comments he made in two newspaper publications. Before the

Court is the motion for summary judgment filed by Defendant Leflore County, Mississippi.

Doc. #43. For the reasons below, the motion will be denied.

**I**
**Summary Judgment Standard**

When a party moves for summary judgment, the reviewing court shall grant the motion

"if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed .R. Civ. P. 56(a). A dispute about a material fact is

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts on

questions of fact must be resolved in favor of the party opposing summary judgment. *See Evans*

*v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted). "Summary judgment

should be used 'most sparingly in ... First Amendment case[s] ... involving delicate constitutional

rights, complex fact situations, disputed testimony, and questionable credibilities.'" *Benningfield*

*v. City of Houston*, 157 F.3d 369, 377 (5th Cir.1998) (alterations in original) (quoting *Porter v. Califano*, 592 F.2d 770, 778 (5th Cir. 1979)).

## II
## Background

On August 26, 2013, Leflore County, Mississippi ("County"), acting through its Board of Supervisors ("Board"), hired Troy Brown as the Director of the Greenwood Leflore Emergency Management Agency ("GLEMA"). Doc. #43-2. The Board is composed of five members: Robert Collins, Phillip Wolf, Anjuan Brown, Robert Moore, and the current Board President, Wayne Self. GLEMA is the County department tasked with disaster preparedness and response. *See generally* MISS. CODE ANN. § 33-15-1, *et seq*. As Director, Brown's job included, among other tasks, interacting with state and federal emergency management agencies to ensure the County was prepared for disasters, and coordinating with first responders to ensure their preparedness to effectively respond to a disaster. Doc. #51-1 at 59:7–18.

When Brown assumed the Director position, one of his first important tasks was to compile and submit an inventory list of GLEMA's equipment to the Board. *Id*.; Doc. #43-5. Brown had difficulty assembling the list to the satisfaction of the Board, missing at least two deadlines to submit the completed inventory.[1] Doc. #43-7; Doc. #43-15; Doc. #43-24. Brown attributed the missed deadlines to several causes, including: (1) an outdated list of GLEMA inventory caused by the failure of his predecessor, T.W. Copper, to complete and sign off on GLEMA's inventory list before his June 2013 retirement;[2] (2) interference by Sam Abraham, the

---

[1] On November 25, 2013, the Board ordered Brown to "finalize his inventory and present [it] to the Board by February 1, 2014." Doc. #43-7. Brown failed to complete the inventory by February 1, 2014, and the Board moved the deadline to February 10, 2014. Doc. #43-15. Brown submitted his inventory on February 10, 2014, but the Board found his submission to be incomplete. *See* Doc. #43-24.

[2] Doc. #51-1 at 68:8–69:14.

County's Chancery Clerk and Administrator,[3] who Brown claims improperly loaned out equipment to other County departments without completing the required forms;[4] (3) a lack of cooperation from other County personnel that possessed certain GLEMA equipment;[5] and (4) a lack of cooperation from two of GLEMA's employees, Bobby Norwood and Dorothy Ivory.[6] Throughout his tenure as GLEMA's director, Brown made these concerns known to his supervisors.[7]

Ultimately, on February 16, 2014, Brown published a guest column in the *Greenwood Commonwealth* ("*Commonwealth*") titled, "*Sam Abraham has it out for me*," detailing some of his concerns about Abraham and public safety. Doc. #51-39. Two days later, the *Commonwealth* published an editorial titled, "*Troy Brown brings lots of drama*," which was very critical of Brown's guest column. Doc #51-41. Brown responded to the editorial in a letter to the *Commonwealth's* Editor titled, "*This is more than a workplace tiff*," which was published in the *Commonwealth* on February 23, 2014. Doc. #51-42.

The day after Brown's letter to the Editor appeared in the *Commonwealth*, the Board voted to terminate Brown. Doc. #51-43. The Board's minutes do not provide a reason for

---

[3] On December 23, 2013, Abraham wrote a letter to Brown identifying issues that he had with Brown's job performance as GLEMA director. Doc. #43-9. In the letter, Abraham complained that Brown was insubordinate for several reasons, including: (1) he stored a privately owned tractor in a County building; (2) he used a County vehicle for private purposes; and (3) he refused to have a GPS device installed in his County vehicle. *Id.* at 1–2. Abraham also complained that on November 15, 2013, Brown exceeded the speed limit while driving a County vehicle, and on December 17, 2013, Brown "took off without turning in a leave form." *Id.* Brown responded with a point by point refutation of Abraham's accusations, stating that "I have not violated and have no intent of violating the rules and regulations of the Leflore County Personnel Policy nor the laws of the State of Mississippi." Doc. #51-29. Notably, Abraham was not Brown's supervisor when he wrote the letter on December 23, 2013. Doc. #51-28 at 5–6.

[4] Doc. #51-26.

[5] Doc. #51-1 at 85:8–86:15; Doc. #51-5 at 10:12–24.

[6] Doc. #51-1 at 70:4–13, 74:23–77:24.

[7] The supervisor to whom Brown reported changed several times—from Abraham to the Board; from the Board back to Abraham; and finally, from Abraham to the Sheriff's Department. *See* Doc. #51-17; Doc. #51-30; Doc. #43-13.

Brown's termination.  *Id*.  But, in the Executive Session where the Board voted 3–2 to terminate Brown, Brown's recent publications in the *Commonwealth* were a prominent topic in the pre-vote discussion.  *See* Doc. #51-9 at 35:4–11.

Brown responded to his termination by filing this action on August 13, 2014, alleging that the County terminated his employment in retaliation for his publications in the *Commonwealth* in violation of his First Amendment rights.  Doc. #1.  The County has filed a motion for summary judgment, arguing that the evidence does not establish a First Amendment violation, and that an affirmative defense under *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), applies to bar Brown's claims.  Doc. #43; Doc. #46.  Brown filed a response in opposition to the motion for summary judgment, and the County filed a reply.  Doc. #50; Doc. #54.

### III
### Discussion

A "public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment."  *Connick v. Myers*, 461 U.S. 138, 140 (1983) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)).  On the other hand, the government's interests in regulating the speech of its employees "differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."  *Id*. (quoting *Pickering*, 391 U.S. at 568).  To establish a prima facie case for First Amendment retaliation, a public employee must show that:

(1) He suffered an adverse employment action;
(2) He spoke as a citizen, rather than pursuant to his official job duties;
(3) He spoke on a matter of public concern;
(4) His interest in the speech outweighed the government's interest in the efficient provision of public services; and

4

(5) His speech precipitated the adverse employment action.[8]

*Hardesty v. Cochran*, No. 14-31114, 2015 WL 4237656, at \*3 (5th Cir. July 14, 2015) (footnote added) (citing *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015)).  If the plaintiff establishes a prima facie case, the defendant may still prevail if it shows by a preponderance of the evidence that it would have come to the same conclusion in the absence of the protected conduct.  *Mt. Healthy*, 429 U.S. at 287.

The County does not dispute that Brown suffered an adverse employment action when he was terminated.[9]  The County argues that summary judgment is appropriate though because Brown failed to present evidence that could satisfy the second, third, fourth and fifth elements of the prima facie standard.  Doc. #46 at 2.  The County also argues that summary judgment is appropriate under *Mount Healthy* because it would have fired Brown even absent his protected speech.  *Id*.  Elements two through four are questions of law that must be resolved by the Court.  *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001) (citing *Connick*, 461 U.S. at 147–48 n.7); *Davis v. McKinney*, 518 F.3d 304, 315 (5th Cir. 2008).  Element five and the *Mount Healthy* affirmative defense are typically questions for the jury.  *See Brady v. Fort Bend Cty.*, 145 F.3d 691, 712 (5th Cir. 1998) (considering both "motivating factor" and "*Mt. Healthy* defense" under section analyzing "Jury's Finding on Causation").

---

[8] The prima facie First Amendment retaliation case has traditionally been identified as a four-element test.  *See Kinney v. Weaver*, 367 F.3d 337, 356 (5th Cir. 2004) ("[A] First Amendment retaliation claim in the employment context has four elements: (1) the plaintiff suffered an adverse employment decision, (2) the plaintiff's speech involved a matter of public concern, (3) the plaintiff's interest in speaking outweighed the governmental defendant's interest in promoting efficiency, and (4) the protected speech motivated the defendant's conduct.").  The second element in the traditional test, "public concern," has always turned on the consideration of "whether the employee spoke as a citizen on a matter of public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).  The five-element test employed here separately addresses the citizen-employee inquiry and public concern inquiry.  In this regard, there is no difference between the four-element and five-element tests.

[9] *See Juarez v. Aguilar*, 666 F.3d 325, 332 (5th Cir. 2011) (citation omitted) (termination is considered adverse employment decision).

**A**
**Citizen Speech**

The County first argues that in his guest column and letter to the Editor, Brown spoke not as a private citizen but as the Director of GLEMA. *See* Doc. #46 at 19–20. The County contends that two facts support this conclusion: Brown is "complaining about his 'official duties,'" and Brown identifies his job title in the guest column. *Id.* at 20.

"For an employee's speech to be entitled to First Amendment protection, []he must be speaking as a citizen on a matter of public concern." *Graziosi v. City of Greenville, Miss.*, 775 F.3d 731, 736 (5th Cir. 2015) (citing *Garcetti*, 547 U.S. at 418). When a public employee speaks pursuant to his official duties, he does not speak as a citizen and his statements are not entitled to constitutional protection. *Garcetti*, 547 U.S. at 421. However, "*Garcetti* did not explicate what it means to speak 'pursuant to' one's 'official duties.'" *Graziosi*, 775 F.3d 737 (quoting *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007)). Recently, in *Lane v. Franks*, the United States Supreme Court explained that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." 134 S.Ct. 2369, 2379 (2014).

Here, the County has offered no authority or argument suggesting that the speech at issue—publications in the local newspaper about the County Administrator's interference with Brown's office—is ordinarily within the scope of Brown's job duties. Instead, the County argues that in the publications, Brown complained about his duties as the Director of GLEMA and submitted his job title in conjunction with his guest column. This type of argument was squarely rejected in *Lane*, which held "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane*, 134 S.Ct. at 2379.

Moreover, the County's argument that Brown submitted his job title along with the guest column is not factually supported by the record evidence. Brown offered his own sworn testimony that the *Commonwealth* added his job title to the guest column after he submitted it for publication.[10] Defendants have not rebutted this sworn testimony. But even if Brown identified his job title in the guest column, this alone would not automatically transform his citizen speech into public employee speech. *See Graziosi*, 775 F.3d at 737 ("identifying oneself as a public employee does not forfeit one's ability to claim First Amendment protections") (citation omitted).

Based on the evidence that Brown published his guest column and letter to the Editor in the *Commonwealth*, and the arguments before the Court at this summary judgment stage, Brown's speech was made as a citizen. *See Davis*, 518 F.3d at 312 (explaining that "prototypical protected speech by public employees [includes] making a public statement, discussing politics with a coworker, writing a letter to newspapers or legislators, or otherwise speaking as a citizen") (internal quotation marks and citation omitted). This conclusion is bolstered by the Fifth Circuit's observation that when a "public employee takes his job concerns to persons outside the work place, ... then those external communications are ordinarily not made as an employee, but as a citizen." *Hardesty*, 2015 WL 4237656, at *3 (quoting *Davis*, 518 F.3d at 313).

---

[10] Brown testified:

> Q  But in any event, when this article was published in the newspaper, you were identified as the Director of the Greenwood-Leflore Emergency Management Agency?
>
> A  He identified me as that.  I didn't.

Doc. #51-24 at 99:19–23.

## B
## Matter of Public Concern

The County next argues that Brown did not speak on a matter of public concern. If Brown did not speak on a matter of public concern, his citizen speech will not be entitled to First Amendment protection. *Graziosi*, 775 F.3d at 736 (citation omitted).

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 134 S.Ct. at 2380 (internal quotation marks and citation omitted); *see also Connick*, 461 U.S. at 146. "An employee's speech may contain an element of personal interest and yet still qualify as speech on a matter of public concern." *Harris v. Victoria Ind. Sch. Dist.*, 168 F.3d 216, 222 (5th Cir. 1999). "[E]ven a mere scintilla of speech regarding a matter of public concern is sufficient to treat the entire communication as mixed speech." *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 826 (5th Cir. 2007). In mixed speech cases, to determine whether speech addresses a matter of public concern, a court must evaluate the "content, form, and context of a given statement, as revealed by the whole record."[11] *Connick*, 461 U.S. at 147–48. "In considering content, form, and context, no factor is dispositive." *Bell v. Itawamba Cty. Sch. Bd.*, 799 F.3d 379, 407 (5th Cir. 2015). But context and form are weighed more heavily than content. *See Teague v. City of Flower Mound, Tex.*, 179 F.3d 377, 382 (5th Cir. 1999) ("[t]aking these three factors together, and weighing the latter two (context and form) more heavily").

---

[11] "The three-factor test has been summarized, at times, as a test to determine whether one is speaking as a citizen or as an employee." *Teague v. City of Flower Mound, Tex.*, 179 F.3d 377, 382 (5th Cir. 1999).

The Fifth Circuit has also recognized "three reliable principles" derived from its case law regarding whether a public employee's speech is made as a citizen on a matter of public concern in mixed speech cases:

> The first principle focuses on content, and it proposes "if releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance, the content of the speech may be public in nature." *Salge* [*v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 185 (5th Cir. 2005) (quoting *Kennedy v. Tangipahoa Par. Library Bd. of Control,* 224 F.3d 359, 372 (5th Cir. 2000), *abrogated on other grounds*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007))]. The second principle, addressing context, states that speech on a matter of public concern "need not be made to the public," although "it may relate to a matter of public concern if it is made against the backdrop of public debate." *Id.* (quoting *Kennedy*, 224 F.3d at 372). The third principle, presumably addressing form, states that speech "cannot be made in furtherance of a personal employer-employee dispute if it is to relate to the public concern." *Kennedy*, 224 F.3d at 372.

*Williams v. Dallas Indep. Sch. Dist.*, No. CIV.A.3:04-CV-1386-L, 2005 WL 2317985, at *7 (N.D. Tex. Sept. 21, 2005), *aff'd*, 480 F.3d 689 (5th Cir. 2007); *see Goudeau v. E. Baton Rouge Par. Sch. Bd.*, 540 Fed. App'x 429, 435 (5th Cir. 2013) ("We have established several principles to consider when deciding whether a speaker's 'mixed speech' relates to a matter of public concern. These principles involve consideration of the content, context, and form of the speech and evaluate whether the speech: informs the populace of more than the fact of an employee's employment grievance, is made against the backdrop of public debate, and is not simply made in furtherance of a personal employer-employee dispute.") (internal quotation marks, punctuation, and citations omitted). The Court will discuss each of these considerations in turn.

### 1
### Content

The content of Brown's speech weighs in favor of a finding that he spoke on a matter of public concern.

*a. Brown's Guest Column*

Brown's guest column titled, "*Sam Abraham has it out for me,*" generally discusses his concern that Chancery Clerk and County Administrator Sam Abraham exerts undue influence over the Board. *See* Doc. #51-39 at 1–2. Brown states in the column that what makes Abraham's influence "*a tragedy is that people's lives are at stake.*" *Id.* at 1 (emphasis added). He expands on this public safety concern, identifying examples of problems purportedly caused by Abraham's influence:

> *When a disaster occurs* and we cannot communicate with the Mississippi Emergency Management Agency because the Internet is inoperable in the Mobile Command Unit, when *our ability to rescue a family is compromised* because we can't find the four-wheelers that will provide access to them, or when (as during the recent winter storm) a supervisor requests a four-wheel-drive vehicle to travel ice-covered roads and that truck has mysteriously "disappeared," what then?
> ….
> I eagerly embraced the task of reviewing GLEMA's inventory to assess whether or not *we are prepared to respond to a disaster* …. The property review should have been simple, right? When you factor in the fact that Sam distributes GLEMA property at will (without consulting me, the person responsible for the inventory) to whomever he pleases, the fact that some in possession of inventory refused to present it for evaluation, and the fact that there is major equipment in disrepair …, a simple task becomes a major issue.
>
> As if the inventory issue were not enough, there is an individual whose salary is partially funded from my budget and whose pay I am asked to endorse. However, I can only communicate with that employee through Sam.

*Id.* at 1–2 (emphases added). Brown also discusses his job performance during a series of winter storms and his belief that Abraham was "orchestrating [his] removal as GLEMA director." *Id.* at 2. He concludes the guest column by writing, "I just hope that what they're doing *does not jeopardize lives when a real disaster occurs.*" *Id.* (emphasis added).

The County characterizes Brown's guest column as "a thinly veiled attempt to transform a personal grievance into a public concern by invoking a supposed popular interest in Brown's

personal grievances with Sam Abraham." Doc. #46 at 16 (internal quotations marks and citation omitted); *see also* Doc. #54 at 5 ("Brown's 'speech' demonstrates one thing: he did not like Sam Abraham. However, Brown's personal feelings towards Abraham are not issues of public concern.").

The County is partially correct. Brown's guest column contains elements of both personal and public concern. This is perhaps due in large part to Brown's particular position with the County. As the Director of GLEMA, an agency charged with ensuring the County's preparedness to deal with natural disasters, Brown's personal employment interest is inextricably linked to a matter of great public concern—public safety. In other words, if an obstacle, such as the acts or omissions of a County official, prevents Brown from effectively carrying out his duties, the public's safety may very well hang in the balance. Recognizing this, Brown discussed the majority of his concerns in the context of public safety, including elected Chancery Clerk and County Administrator Abraham's purported mishandling of GLEMA equipment and his undue influence over members of the Board, who are also elected County officials. In this regard, Brown's speech informs the public of considerably more than any personal grievance with Abraham. *See Kennedy*, 224 F.3d at 372 ("If releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance, the content of the speech may be public in nature.") (citation omitted).

The County also argues that many of Brown's examples of Abraham's influence and conduct are overstated or false. *See, e.g.*, Doc. #46 at 17-18. This argument is unpersuasive because "[w]hether an employee's speech is true or false … plays no role in the determination whether the speech concerned a matter of public interest." *Salge*, 411 F.3d at 185.

For these reasons, the Court finds that the primary issues addressed in Brown's guest column—public safety and Abraham's purported undue influence over the Board—are matters that can "fairly considered as relating to [a] matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146; *see also Kennedy*, 224 F.3d at 373 ("Speech that potentially affects public safety relates to the public concern.") (citations omitted); *Graziosi*, 775 F.3d at 738 ("It is well established that speech exposing or otherwise addressing malfeasance, corruption or breach of the public trust, … touches upon matters of public concern.") (collecting cases).

The Court also finds that the primary issues raised in Brown's guest column were the subject of legitimate news interest because in at least two separate articles published before Brown's guest column, the *Commonwealth* covered the very issues Brown later discussed in his guest piece.[12] *See Salge*, 411 F.3d at 189 ("[T]he very fact of newspaper coverage [of the issue discussed by the employee] indicates that the public was receptive and eager to hear about [the issue].") (internal quotation marks and citation omitted).

### b. Letter to the Editor

As mentioned above, in response to Brown's guest column, the *Commonwealth* published an editorial titled, "*Troy Brown brings lots of drama*." Doc. #51-41. The editorial focuses primarily on Brown and Abraham's strained working relationship and Abraham's purported "power and influence" in the County. *Id.* at 1. Brown responded to the editorial in a letter to the Editor of the *Commonwealth* titled, "*This is more than workplace tiff*." Doc. #51-42.

In the letter, Brown acknowledges that his guest column touches on "workplace issues" and provides additional insight into the influence he believes Abraham exerts over the Board.

---

[12] *See, e.g.*, Doc. #43-14 at 1–3 (discussing Brown's tenure as GLEMA director, Abraham's alleged mishandling of GLEMA property, and Abraham's influence over Board); Doc. #51-33 at 2 (discussing former-board president's belief that Board "is being run by" Abraham).

*See id.* As explained above, any undue influence over the Board by Abraham is a matter that can be "fairly considered as relating to [a] matter of political, social, or other concern to the community" and is "a subject of legitimate news interest." *Lane*, 134 S.Ct. at 2380 (internal quotation marks and citations omitted).

In sum, the content of Brown's guest column and letter to the Editor weighs in favor of a finding that Brown spoke primarily on a matter of public concern.

## 2
## Form

The form of Brown's speech—publications in the local newspaper—weighs in favor of a finding that Brown spoke on a matter of public concern.[13] *See Montgomery v. Mississippi*, 498 F. Supp. 2d 892, 913 (S.D. Miss. 2007) ("As for form, a newspaper is a public forum, and letters to the editor are traditional means of communicating with the public") (citation omitted).

## 3
## Context

Finally, the context of Brown's speech weighs slightly in favor of finding that he spoke on a matter of public concern.

The County argues that Brown published his column and letter after failing to carry out his job duties and that his speech was made within the context of a private employee-employer dispute. *See, e.g.*, Doc. #46 at 16–18; Doc. #54 at 4–6. As explained above, the Court has found that Brown's speech partially pertains to personal matters, namely Brown's personal grievance with Abraham, which "militates against a finding that [Brown's] speech was public in nature." *Graziosi*, 775 F.3d at 739 (citation omitted). However, the Court must also consider that Brown's column and letter were published after the *Commonwealth* had already begun to cover

---

[13] The parties do not specifically address the issue of form in their briefs.

the same issues about which Brown spoke, and that Brown's letter to the Editor was a direct response to an editorial written about him. *See Kennedy*, 224 F.3d at 373 ("speech made against the backdrop of ongoing commentary and debate in the press involves the public concern") (citations omitted); *Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 191 (5th Cir. 1988) ("statements in the letter must be seen in the context of a continuing commentary that had originated in the public forum of the newspaper").

Weighing the content, form, and context of Brown's speech together, and giving more weight to its form and context, the Court finds that Brown's speech merely touches on an element of personal concern in the broader context of a matter of public concern. Accordingly, Brown's citizen speech is entitled to First Amendment protection. *See Graziosi*, 775 F.3d at 736 (explaining public employee's citizen speech on matter of public concern entitled to First Amendment protection) (citation omitted).

## C
### *Pickering* Balancing Test

The County next argues that Brown cannot prevail under the *Pickering* balancing test. The *Pickering* test requires the Court "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [County], as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. The burden "varies depending upon the nature of the employee's expression. The more central a matter of public concern the speech at issue, the stronger the employer's showing of counterbalancing governmental interest must be." *Jordan v. Ector Cty.*, 516 F.3d 290, 299 (5th Cir. 2008) (internal footnote, quotation marks, and punctuation omitted). The *Pickering* test is therefore a "sliding scale under which 'public concern' is weighed against disruption: '[a] stronger showing of disruption may be necessary if

the employee's speech more substantially involves matters of public concern.'" *Matherne v. Wilson*, 851 F.2d 752, 761 (5th Cir. 1988) (internal punctuation omitted) (quoting *Gonzalez v. Benavides*, 774 F.2d 1295, 1302 (5th Cir. 1985)). Among the factors to consider are:

> (1) the degree to which the employee's activity involved a matter of public concern; (2) the time, place, and manner of the employee's activity; (3) whether close working relationships are essential to fulfilling the employee's public responsibilities and the potential effect of the employee's activity on those relationships; (4) whether the employee's activity may be characterized as hostile, abusive, or insubordinate; [and] (5) whether the activity impairs discipline by superiors or harmony among coworkers.

*Brady*, 145 F.3d at 707 (citing *Click v. Copeland*, 970 F.2d 106, 112 (5th Cir. 1992)). "The indispensable predicate to balancing, however, is evidence from the public employer of actual or incipient disruption to the provision of public services. Without such evidence, there simply is no countervailing state interest to weigh against the employee's First Amendment rights." *Grogan v. Lange*, 617 Fed. App'x 288, 292 (5th Cir. 2015) (internal quotation marks and citations omitted).

In this regard, the County argues:

> Plaintiff's "speech" was potentially insubordinate, potentially detriment[al] to the working relationships of GLEMA department employees and intradepartmental employees, and had the potential to do further damage if left unaddressed by the Board of Supervisors. Brown's lack of ability to work with others, lack of respect for authority properly exercised, and insubordination cannot be tolerated if the goal is to provide comprehensive, efficient emergency services to the community.
> ….
> There can be no serious dispute about the importance of the working relationships among the GLEMA employees, as well as between the GLEMA director and employees of the fire and Sheriff's departments. Given the importance of such relationships, and the need for these departments to work together in emergency situations, Plaintiff's interest in publicly airing his disagreements with Abraham is outweighed by Leflore County's interests in providing efficient public services and promoting an environment of unity amongst county departments.

Doc. #46 at 21. The County does not offer any record evidence to support its claims of disruption. This is fatal to the County's argument because in the absence of such evidence,

"there simply is no countervailing state interest to weigh against [Brown's] First Amendment rights." *Grogan*, 617 Fed. App'x at 292 (internal quotation marks and citation omitted).

In contrast to the County's argument, there is considerable record evidence that Brown's speech did not cause any disruptions. The three Board members who voted to fire Brown—Wolf, Anjuan Brown, and Self—all testified that Brown's speech did not interfere with the County's operations.[14] *See* Doc. #51-6 at 50:6–52:8; Doc. #51-7 at 20:20–24, 22:14–16; Doc. #51-8 at 22:12–15. Abraham testified similarly. *See* Doc. #51-28 at 21:16–21, 22:9–14.

For these reasons, the *Pickering* balancing test must be resolved in Brown's favor.

## D
## Speech as Motivating Factor

The County further argues that summary judgment is appropriate because Brown cannot show that his termination was motivated by his speech. *See* Doc. #46 at 22–24. "[T]he plaintiff need only demonstrate that his speech was one factor among others motivating the defendant's conduct, and, if such a showing is made, it falls to the latter to demonstrate that it would have made the same decision even absent retaliation." *Boisseau v. Town of Walls, Miss.*, No. CIV.A. 3:14CV149, 2015 WL 5883176, at *4 (N.D. Miss. Oct. 8, 2015) (citation omitted).

The County faces a tough task in seeking summary judgment on this "causation" issue because, unlike the *Pickering* balancing test which is a legal issue for the Court to decide, "[w]hether an employee's protected conduct was a substantial or motivating factor in an employer's decision to take action against the employee is a question of fact, ordinarily rendering summary disposition inappropriate." *Click*, 970 F.2d at 113. This task is even more

---

[14] Wolf speculated that Brown's speech "[m]ight have … interfer[ed] with some inefficiency for morale." Doc. #51-6 at 51. However, Wolf testified that no employee had complained of a drop in efficiency or morale. *Id.* Without a basis for his belief, Wolf's speculative testimony regarding the impact of Brown's speech is inadmissible *Washington v. Dep't of Transp.*, 8 F.3d 296, 300 (5th Cir. 1993) ("Under the Federal Rules of Evidence, speculative opinion testimony by lay witnesses – i.e., testimony not based upon the witness's perception – is generally considered inadmissible.").

difficult given the temporal proximity involved in this case and the County's concession that Brown's "'speech' was known to the Board before Brown was fired." Doc. #46 at 24.

The temporal proximity between Brown's speech and his termination establishes a genuine and material fact issue on causation. Brown published his guest column on February 16, 2014, and his letter to the Editor on February 23, 2014. Doc. #51-39; Doc. #51-42. The County terminated Brown on February 24, 2014. "Close timing between an employee's protected [speech] and an adverse employment action can be a sufficient basis for a court to find a causal connection required to make out a *prima facie* case of retaliation." *Mooney v. Lafayette Cty. Sch. Dist.*, 538 Fed. App'x 447, 454 (5th Cir. 2013); *see Nagle v. Marron*, 663 F.3d 100, 111 (2d Cir. 2011) (holding that six weeks between speech and adverse action was sufficient "showing of temporal proximity suffices to make out a prima facie claim of retaliation under the First Amendment").

But more than mere temporal proximity is the County's failure to identify any conduct by Brown between the time of his speech and his termination that led to the termination decision. "When an employer is trying to establish the lack of a causal connection in a retaliation case in which there is temporal proximity, it typically points to nonretaliatory conduct occurring before or after the protected activity." *Smith v. Coll. of the Mainland*, 63 F. Supp. 3d 712, 719 (S.D. Tex. 2014) (Costa, J., circuit judge sitting by designation) (citation omitted). Events occurring before the protected activity are insufficient to break the causal link established by temporal proximity. *Id*. at 719–20 ("[T]he College contends that it fired him … because of the totality of conduct that predated the lawsuit. Given the lack of an intervening non-protected incident between the lawsuit and the termination, a jury could conclude that the more recent lawsuit was a

motivating factor in the termination.") (citing *Sanders v. Sailormen, Inc.*, 506 Fed. App'x 303, 304 (5th Cir. 2013)).

The County contends that it terminated Brown because of his pre-speech job performance. *See* Doc. #46 at 23–24 (identifying Brown's write up by Abraham on December 23, 2013, Brown's failure to complete GLEMA inventory by February 1, 2014, and Brown's submission of inadequate GLEMA inventory on February 10, 2014).[15] But Brown's pre-speech job performance issues do not break the causal link that can be inferred from the temporal proximity involved in this case; at best, these issues merely create a fact issue. This is so because the last-occurring job performance issue identified by the County happened on February 10, 2014. Notably, the County submitted a video of the Board meeting held that day. Doc. #43-24. In that meeting, the Board gave no indication that it planned to terminate Brown. Indeed, at the conclusion of Brown's presentation, Board President Wayne Self stated, "Alright Mr. Brown, I think we are going to hold everything … hold this … until the next meeting. Once you get everything situated and together, you know, just bring it back to us and let us see it." *Id.* at 0:32:19–0:32:38. This invitation to Brown to attend and present at the next Board meeting suggests that the Board, as of February 10, 2014, had no intent to terminate Brown. Considering the lack of an intervening non-protected incident between Brown's speech and the termination, a jury could reasonably conclude that Brown's speech, an intervening protected activity, was a motivating factor in the termination.

---

[15] The County also argues that Brown: (1) "never satisfactorily performed the duties of his position despite the Board's efforts to assist him by placing him under the direction of three different supervisors; (2) "never took the time to learn the job of Director of GLEMA;" and (3) "did not work well with others who were trying to help him succeed." Doc. #46 at 23. Even if negative traits (as opposed to conduct) could be considered intervening, the County has failed to identify anything in the record which would justify such a conclusion here.

Also, there is unchallenged direct evidence[16] that Brown's speech was a motivating factor in the termination. After Brown's termination, Board President Self was interviewed by Bryn Stole, a reporter with the *Commonwealth*. In the resulting article, Stole wrote:

> Self said Brown's decision to air his complaints in the newspaper factored into his decision to fire him.
>
> "Running to the paper, that hurt me tremendously," Self said. "If you've got a problem with one of the county employees, your job is to go to your immediate supervisor, which is Sheriff (Ricky) Banks. He didn't go to him."

Doc. #51-44 at 2. In his deposition, Stole clarified the context in which Self offered the quoted statements:

> I had specifically asked him why the board fired Troy. I don't know why he would have brought something that didn't factor into that decision up in response to a question about why did you fire Troy.

Doc. #51-31 at 45:1–5. Board member Moore testified that he also heard Self say that Brown's speech factored into the termination decision. Doc. #51-9 at 35:18–36:1. Moreover, Moore confirmed that Brown's speech was discussed so heavily in the Executive Session where the termination vote occurred that he felt compelled "to remind [the Board] that freedom of speech was not the issue they needed to be dealing with." *Id.* at 35:4–11. The discussion of Brown's speech in a clearly retaliatory context could lead a jury to reasonably believe those considerations influenced the Board's vote.

For these reasons, there is sufficient evidence on this quintessentially fact-based causation question to allow it to be decided by a jury.

---

[16] Much of this evidence may be classified as hearsay but no evidentiary challenges have been lodged against it. *See BGHA, LLC v. City of Universal City, Tex.*, 340 F.3d 295, 299 (5th Cir. 2003) (party waived hearsay objection at summary judgment stage by failing to object to admission).

## E
### *Mount Healthy* Affirmative Defense

The County can still prevail if it establishes that it would have terminated Brown regardless of his protected speech. *Mt. Healthy*, 429 U.S. at 287; *Brady*, 145 F.3d at 712 ("*Mt. Healthy* … allows the defendant to avoid liability once the plaintiff has carried his burden of proving that an improper consideration was a substantial or motivating factor … by proving that it would have taken the same adverse action even in the absence of the improper consideration.") (citations omitted). "Yet because this is another factbound causation issue, ... [the County] faces another uphill climb at the summary judgment stage. Even more so because this is an affirmative defense on which it has the burden." *De La Garza v. Brumby*, No. 6:11-CV-37, 2013 WL 754260, at *6 (S.D. Tex. Feb. 27, 2013) (citations omitted).

In the attempt to satisfy its burden, the County argues:

All supervisors testified that the failure to complete the inventory was the main reason Brown was fired although his work habits, and the recommendation of Sheriff Banks, played a role. Of the three supervisors who voted to fired [sic] Brown — Wolfe, Brown, and Self — Self is the only supervisor to whom retaliatory animus may arguably be attributed. According to Supervisors Collins and Moore — the two supervisors who did not vote to fire Brown — the newspaper articles were mentioned or discussed during the executive session to decide whether to fire Brown. Anjuan Brown and Phil Wolfe were aware of Brown's "speech" and voted to fire him any way. The two who voted "nay" were never going to change the votes of the three who voted "yea." The "nay" supervisors did not have the votes needed to keep Brown employed. *See* Ex. 30, Self Dep.; Ex. 21, Article Feb. 25, 2014. Supervisor Robert Moore admitted that the vote to fire Brown would have been the same regardless of Plaintiff's "speech." *See* Ex. 39, Moore Dep. Given the composition of the Board Brown was going to be fired. Since the purpose underlying *Mt. Healthy* is that a public employee should not be placed in a better position than he would have had he done nothing, Brown should not be rewarded when he was going to be terminated anyway.

Plaintiff's conduct, lack of success in his position and failure to adhere to Leflore County government policies and procedures clearly justified termination, regardless of any protected speech. Thus, even assuming Brown can prove that his speech motivated his termination, the record is clear that Brown's actions, and

more importantly his overwhelming lack of action, would have resulted in the same adverse employment action — his termination.

Doc. #46 at 25. Brown argues in response that the County has failed to carry its burden because all it "offers is self-serving testimony by the board members that they would have voted to terminate Brown anyways"; and "[t]he jury is the proper forum to decide whether this self-serving testimony from an interested witness is credible." Doc. #50 at 32, 33.

While the Court does not question that there were quite possibly a myriad of reasonable bases for terminating Brown's employment, the Court first looks to the reasons provided in the Board minutes. The Board minutes of February 24, 2014, do not expressly identify a single reason for Brown's termination; instead, the minutes vaguely state that "the Board discussed several issues pertaining to Mr. Brown and his work habits" before terminating Brown. *See* Doc. #43-20. This vague all-encompassing language *could* include some of the reasons argued by the County, but it is insufficient to satisfy the County's burden. This is so because the issue is not whether Brown *could* have been terminated for his pre-speech job performance, but whether he *would* have been terminated if he had not engaged in protected speech. *See Haverda v. Hays Cty.*, 723 F.3d 586, 597 (5th Cir. 2013) ("The issue is not whether Haverda *could* have been demoted for [misconduct] but whether he *would* have been demoted if he had not engaged in protected speech.") (emphases added and citations omitted).

Because the vote to terminate Brown was held in a closed-door session, only the Board members can provide testimony as to whether the Board would have voted to terminate Brown notwithstanding his protected speech. In this vein, the County argues that "[a]ll supervisors testified that the failure to complete the inventory was the main reason Brown was fired although his work habits, and the recommendation of Sheriff Banks, played a role," and "[t]he two who voted 'nay' were never going to change the votes of the three who voted 'yea.'" Doc. # 46 at 25.

But the County provides no citations to record evidence in support of these propositions. In other words, the County has offered only unsubstantiated argument. For this reason alone, the County is not entitled to summary judgment on its *Mount Healthy* affirmative defense. *See* 10B CHARLES ALAN WRIGHT ET AL., FED. PRACTICE AND PROCEDURE § 2734 (3d ed. 2014) ("if all of the moving party's defenses … require the adjudication of fact issues, the request for summary judgment will be denied").

Even if the County had proffered relevant testimony of the Board members, the Court would still deny summary judgment. Brown produced record evidence that: (1) his protected speech was such a prominent topic of discussion during the Board's Executive Session that one of the Board members felt compelled to remind the rest of the Board about Brown's First Amendment rights;[17] (2) the Board knew about his protected speech and considered it in making the termination decision; and (3) his immediate predecessor also failed to complete the GLEMA inventory list and was not fired.[18] A reasonable jury considering this evidence could find that the County failed to show that it would have terminated Brown in the absence of the protected speech. *See, e.g.*, *De La Garza*, 2013 WL 754260, at *6 (finding fact issue on *Mt. Healthy* affirmative defense where Plaintiff demonstrated both direct and inferential evidence of retaliation); *see Jordan*, 516 F.3d at 301 ("However plausible, even compelling, the proffered justifications for firing [the plaintiff] sound in isolation, the evidence that others had engaged in conduct similar to [the plaintiff's] without being disciplined is sufficient for a reasonable jury to conclude that [the employer] would not have taken the same action in the absence of the protected conduct."). Moreover, considering that "[s]ummary disposition of the causation issue in First Amendment retaliation claims is generally inappropriate," *Hardesty*, 2015 WL 4237656,

---

[17] Doc. #51-9 at 35:4–11.

[18] Doc. #51-1 at 68:8–69:14.

at \*6; and that it is "[o]ften … for the jury to determine the credibility of … testimony of an interested witness," 9B Charles Alan Wright Et Al., Fed. Practice and Procedure § 2527 (3d ed. 2014), such as the County Board members, the Court would deny summary judgment for these additional reasons.

## IV
## Conclusion

For the reasons above, the County's motion [43] for summary judgment is **DENIED**.

SO ORDERED, this 15th day of December, 2015.

/s/ Debra M. Brown
**UNITED STATES DISTRICT JUDGE**